| | |
|---|---|
| JANICE DAMPARE, | ) |
| Plaintiff, | ) |
| | ) CIVIL ACTION NO. 3:25-cv-400 |
| v. | ) |
| | ) |
| WELLS FARGO BANK, N.A., | ) |
| Defendant. | ) |

## COMPLAINT (JURY TRIAL DEMANDED)

Plaintiff Janice Dampare ("Plaintiff" or "Ms. Dampare"), by her attorneys Mesidor PLLC, complaining of Defendant Wells Fargo Bank, N.A. ("Defendant", "Wells Fargo", "Bank", or "Company"), alleges, upon knowledge as to herself and her own actions and upon information and belief, as to all other matters as follows:

## NATURE OF CLAIMS

1. Ms. Dampare, by and through her undersigned counsel, alleges violations of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), North Carolina common law and any other claim(s) that can be inferred from the facts set forth herein and seeks damages to redress the injuries Plaintiff suffered as a result of being subjected to unlawful discrimination and retaliation by Defendant.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts federal law claims under Section 1981 and Title VII. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the actions or omissions giving rise to the claims alleged herein occurred within this judicial district.

## PROCEDURAL PREREQUISITES

4. On or about February 28, 2025, Plaintiff filed a Charge of Discrimination with the Equal Employment Office Commission ("EEOC").

5. On or about March 14, 2025, Plaintiff received a Notice of Right to Sue from the EEOC.[1]

6. This action is being commenced within 90 days of receipt of the Notice of Right to Sue.

## PARTIES

7. Ms. Dampare resides in the State of Georgia.

8. Defendant Wells Fargo is and has been a multinational company providing banking and other financial services. They are registered to do business under the laws of the State of Delaware, with a corporate office located at 420 Montgomery Street San Francisco, California 94104.

9. At all times relevant, Wells Fargo employed more than fifteen employees.

10. Upon information and belief, Wells Fargo maintains control, oversight, and direction over the operation of its facilities, including its employment practices.

11. At all times relevant, Wells Fargo was and is an "employer" and Ms. Dampare's employer as defined by Title VII and all applicable statutes referenced herein.

---

[1] Attached hereto as **Exhibit A**.

## MATERIAL FACTS

12. On or about August 2, 2004, Ms. Dampare, an African American woman, began working for Wells Fargo as a Brokerage Customer Service Representative.

13. Ms. Dampare excelled in that role and was ultimately promoted to Officer at the Bank. Due to high performance, Ms. Dampare was subsequently promoted to the position of Assistant Vice President and finally to the position of Vice President.

14. During Ms. Dampare's almost twenty-year tenure at Wells Fargo, she performed above expectations in every role she held at the Bank. Her growth at Wells Fargo reflected years of hard work and dedication to the Company. Throughout her employment, Ms. Dampare consistently received exceptional performance evaluations and assessments.

15. Ms. Dampare was consistent in her hard work, dedication, growth, and leadership at Wells Fargo, as evidenced by her nearly two decades of consistent positive feedback in performance assessments and through her significant growth and increase in responsibilities since beginning her career at Wells Fargo. Each year, her performance assessment demonstrated that she was an employee who made tremendous contributions to the Company and performed invaluable work. Ms. Dampare unequivocally demonstrated that she was an asset to Wells Fargo and her colleagues.

16. In or about January 2022, Ms. Dampare was slated to receive a promotion due to her positive contributions to the Company.

17. In or about February 2022, Ms. Dampare received verbal approval from her manager at the time, Christian Castillo ("Mr. Castillo"), to work from any Wells Fargo location in either North Carolina or Georgia to satisfy the Company's three-day in office work requirement.

18. This approval was based on the financial hardship Ms. Dampare experienced after she moved to Atlanta, Georgia which significantly increased her commuting, fuel, and other expenses associated in traveling to her assigned office in Charlotte, North Carolina. The approval for this exception was formally documented by Ms. Castillo.

19. In October 2023, Ms. Dampare was assigned to Director, Kendis Mondell's ("Ms. Mondell") team. Shortly thereafter, the once pleasant and productive work environment Ms. Dampare experienced at the Bank drastically changed.

20. On this new team, Ms. Dampare was the only African American.

21. In November 2023, after being reassigned to Ms. Mondell's team, Ms. Dampare received an email from Ms. Mondell requesting the details of her exception, inquiring into which days Ms. Dampare would be in the office, and requesting that she attend in-person meetings with the team on Tuesdays in the Charlotte, North Carolina location.

22. Despite the fact that there was no identifiable business need for Ms. Dampare to work from the Charlotte office, Ms. Mondell ultimately revoked Ms. Dampare's exception and required her to work in the Charlotte office three days per week beginning in January 2024.

23. Ms. Mondell's treatment of Ms. Dampare stood in stark contrast to the white members of her team.

24. Unlike Ms. Dampare, a white male colleague supervised by Ms. Mondell's team, who also had an exception, was not held to the same level of scrutiny. This male colleague was not required to inform Ms. Mondell what specific days he intended to work from the office.

25. Likewise, a white female colleague on Ms. Mondell's team was permitted by Ms. Mondell to work remotely without having to come into the office three days a week.

26. Ms. Mondell's behavior towards Ms. Dampare further demonstrated her racial bias. Ms. Mondell was often rude, hostile and condescending towards Ms. Dampare, the only African American woman on her team. Conversely, Ms. Mondell treated Ms. Dampare's white co-workers with respect.

27. In her one-on-ones with Ms. Mondell's manager, Tonya Rowe ("Ms. Rowe"), Ms. Dampare described Ms. Mondell as aggressive, demeaning, intimidating, rude, and hostile based on her tone and attitude, noting that Ms. Mondell criticized one Ms. Dampare's co-workers due to his friendship with Ms. Dampare.

28. In speaking with other African American women who were previously supervised by Ms. Mondell, Ms. Dampare learned that Ms. Mondell demonstrated a pattern of behavior toward African American women which involved belittling, demeaning, and treating them rudely. Ms. Mondell did not treat non-African American women in this manner.

29. Ms. Mondell also held Ms. Dampare to more stringent standards than her non-Black co-workers and forced her to abide by arbitrary and unreasonable deadlines. Ms. Mondell further excluded Ms. Damapare from team meetings and events and permitted her to work remotely much less frequently than Ms. Dampare's white colleagues.

30. Ms. Mondell also singled Ms. Dampare out by requiring that she submit her Paid Time OFF ("PTO") requests two weeks in advance while not requiring this of other employees. When Ms. Dampare asked Ms. Mondell why she was singled out for this treatment, Ms. Dampare did not respond.

31. On multiple occasions, Ms. Mondell said to Ms. Dampare that it "would look good for optics" if she attended the optional lunch meetings. Ms. Dampare typically chose to work during her lunch hour instead of joining the optional meeting. Although numerous other employees

likewise skipped the optional lunch meetings, only Ms. Dampare was repeatedly pressed by Ms. Mondell to attend.

32. As such, after receiving another suggestion to attend, Ms. Dampare asked Ms. Mondell "Are you inviting me because I am the only Black person on the team," to which Ms. Mondell replied, verbally expressing a clear racial bias, "You know how you Blacks are."

33. Having seen Ms. Mondell demonstrate discriminatory views in both her words and her actions, Ms. Dampare repeatedly sought a transfer to another team, but her requests were denied.

34. On April 23, 2024, Ms. Dampare reported the unbearable work conditions and Ms. Mondell's discriminatory treatment to Human Resources.

35. However, on April 25, 2024, just two days after engaging in protected activity by reporting this unlawful treatment, Ms. Dampare was baselessly placed on a Performance Improvement Plan ("PIP"). In her nearly twenty prior years with Defendant, Ms. Dampare had no performance issues.

36. To add insult to injury, Human Resources also wrongfully determined that there was not enough evidence to support or prove Ms. Dampare's claims of discrimination.

37. Following Ms. Dampare's complaint to Human Resources, Ms. Mondell began a pattern of conduct aimed at sabotaging Ms. Dampare's career with Wells Fargo.

38. In addition to the unjustifiable PIP, Ms. Mondell started reassigning Ms. Dampare's work to other employees. Ms. Mondell further scheduled work meetings with business partners and set assignment deadlines for times she knew Ms. Dampare was taking paid time off. Ms. Mondell then criticized Ms. Dampare for being "unavailable" to business partners during those times.

Page **6** of **16**
Case 3:25-cv-00400-FDW-SCR     Document 1     Filed 06/11/25     Page 6 of 16

39. On May 9, 2024, Ms. Mondell told Ms. Dampare she would no longer be permitted to work from home because she did not "get along with [her] peers," naming Kent Oglesby and Robyn Johnson. Ms. Mondell claimed that Kent Oglesby had complained of frequent phone calls from Ms. Dampare which prevented him from completing his work. After the meeting, Ms. Dampare approached Kent Oglesby to apologize, only to be told that he had made no such complaint to Ms. Mondell.

40. When Ms. Dampare likewise attempted to apologize to Robyn Johnson, she also reported that she had not complained to Ms. Mondell.

41. A similar incident later occurred with another colleague, Kevin Gonzalez ("Mr. Gonzalez"). He called Ms. Dampare to check-in regarding a morale issue, and she gave advice to cross-train a peer to create backup measures for reporting duties. In a subsequent one-on-one with Ms. Mondell, this suggestion was twisted into an accusation that Ms. Dampare was trying to assign her work to other team members. When Ms. Dampare pushed back, Ms. Mondell attempted to dismiss this deliberate distortion as a "misunderstanding" of Mr. Gonzalez's words. This only added to the pattern of Ms. Mondell twisting words in an attempt to discredit, bully, and humiliate Ms. Dampare.

42. On or about May 29, 2024, Ms. Dampare suffered a severe panic attack due to the overwhelming stress caused by Ms. Mondell's discriminatory and retaliatory treatment of her. Other panic attacks soon followed. Forcing Ms. Dampare to take several days of medical leave to recover. Ms. Dampare was subsequently approved for intermittent FMLA leave.

43. Despite Ms. Dampare's approval for FMLA leave, Ms. Mondell attempted to frustrate Ms. Dampare's ability to use the leave, by directing Ms. Dampare to schedule her leave in advance, which she could not and was not required to do, as she did not know when the working

conditions would cause her to have panic attacks. When Ms. Dampare explained this to Ms. Mondell, Ms. Mondell said "you look fine to me."

44. Ms. Dampare was allowed 30 days to submit her FMLA leave hours. However, Ms. Mondell disapproved of Ms. Dampare taking leave and insisted that she input her hours immediately, contrary to the Company's policies and rules.

45. Ms. Mondell also disparaged Ms. Dampare in front of colleagues for taking FMLA leave and implied that she did not need it.

46. On Friday, June 7, 2024, and Monday, June 10, 2024, Ms. Dampare had pre-approved PTO. On the first of these PTO days, June 7, 2024, Ms. Mondell, who had access to Ms. Dampare's calendar, sent an email arbitrarily assigning her a task to complete by the end of the day despite having full knowledge that Ms. Dampare was not working that day and without any legitimate business justification for the quick turnaround. On the latter day, June 10, 2024, Ms. Mondell did the exact same thing, in a thinly-veiled attempt to frame Ms. Dampare as unable to complete her tasks.

47. On June 23, 2024, Ms. Dampare met with Lead Employment Investigator, Mark Sitko ("Mr. Sitko") to report the retaliation that she experienced after her prior complaint to Human Resources regarding the racial discrimination perpetuated by Ms. Mondell.

48. At that meeting, Ms. Dampare explained that Ms. Mondell reassigned one of her business groups to another colleague in an act of retaliation. Specifically, Ms. Dampare noted that Ms. Mondell had emailed one of Ms. Dampare's business lines that Ms. Dampare would no longer support the group because of her workload, without any communication with Ms. Dampare regarding her workload.

49. Ms. Dampare further explained to Mr. Sitko that the issues she was experiencing had nothing to do with her workload but had everything to do with Ms. Mondell and her discriminatory and unprofessional conduct toward her.

50. Indeed, Ms. Mondell's discriminatory and retaliatory behavior was so evident that one of Ms. Dampare's white co-workers filed a complaint about Ms. Mondell with HR on Ms. Dampare's behalf.

51. Moreover, Ms. Dampare's colleagues overheard Ms. Mondell state that "some people are not meant to be high performers, and they need to think twice about going to Human Resources". A clear indication that Ms. Mondell intended to punish Ms. Dampare for engaging in protected activity.

52. Nonetheless, Defendant took no meaningful action to address Ms. Mondell's discriminatory or retaliatory behavior.

53. On July 18, 2024, in a further act of retaliation, Ms. Dampare was placed on a Corrective Active Plan and given just one month to improve her supposedly deficient performance issues that had suddenly arisen after nearly two decades working for Defendant.

54. On August 15, 2024, Defendant terminated Ms. Dampare's employment, not even waiting the full month provided by the Corrective Action Plan.

## FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER SECTION 1981

55. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

56. 42 U.S.C. § 1981 states, in the relevant part, as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal

benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

57. As described herein, Defendant discriminated against Plaintiff on the basis of her race in violation of Section 1981, by fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment and terminating her employment.

58. As a result of Defendant's unlawful discriminatory conduct in violation of Section 1981, Plaintiff suffered economic loss, for which she is entitled to an award of monetary damages and other relief.

59. As a result of Defendant's unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

60. The unlawful discriminatory actions of Defendant constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
## FOR RETALIATION UNDER SECTION 1981

61. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

62. As described herein, Plaintiff engaged in activities protected by Section 1981 by complaining of racial discrimination and retaliation.

63. After Plaintiff engaged in protected activities, Defendant retaliated against Plaintiff as described herein.

64. Defendant would not have terminated Plaintiff, but for Plaintiff's complaints of discrimination and retaliation.

65. Such retaliatory treatment would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

66. As a result of Defendant's unlawful conduct in violation of Section 1981, Plaintiff has suffered economic loss, for which Plaintiff is entitled to an award of monetary damages and other relief.

67. As a result of the unlawful conduct of Defendant in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

68. The unlawful discriminatory actions of Defendant constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiff is entitled to and an award of punitive damages.

## THIRD CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII

69. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

70. 42 U.S.C. § 2000e-2(a)(1) states in part:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual, or otherwise to discriminate against any individual with respect to their compensation, terms, conditions, or privileges of employment, because such individual's **race**, color, religion, sex, or national origin.

Page **11** of **16**
Case 3:25-cv-00400-FDW-SCR    Document 1    Filed 06/11/25    Page 11 of 16

(emphasis added).

71. As described herein, Defendant discriminated against Plaintiff on the basis of her race, by fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment and terminating her employment.

72. As a result of Defendant's unlawful discriminatory conduct in violation of Title VII, Plaintiff suffered economic loss, for which she is entitled to an award of monetary damages and other relief.

73. As a result of Defendant's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

74. The unlawful discriminatory actions of Defendant constitute malicious, willful, and wanton violations of Title VII, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## FOURTH CAUSE OF ACTION
## FOR RETALIATION UNDER TITLE VII

75. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

76. 42 U.S.C. § 2000e-3(a) provides that it shall be unlawful employment practice for an employer:

> [T]o . . . discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

77. As described herein, Plaintiff engaged in protected activities by complaining of discrimination and retaliation.

78. After Plaintiff engaged in protected activities, Defendant retaliated against Plaintiff as described herein.

79. Defendant would not have placed Plaintiff on a Corrective Action Plan and would not have subsequently terminated Plaintiff, but for Plaintiff's complaints of discrimination.

80. Such retaliatory treatment would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

81. As a result of Defendant's unlawful conduct in violation of Title VII, Plaintiff has suffered economic loss, for which Plaintiff is entitled to an award of monetary damages and other relief.

82. As a result of the unlawful conduct of Defendant in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

83. The unlawful discriminatory actions of Defendant constitute malicious, willful, and wanton violations of Title VII, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

### FIFTH CAUSE OF ACTION
### FOR WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY
### (NORTH CAROLINA COMMON LAW)

84. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

85. Plaintiff was terminated from her position as Vice President because of her race, African American, and because she participated in protected activities as described herein.

86. The public policy of North Carolina, as expressed in N.C. Gen. Stat. Section 143-422.2, protects and safeguards the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on the basis of race or protected activity by employers who regularly employ fifteen (15) or more employees.

87. The stated public policy recognizes that the practice of denying employment opportunities and discriminating in the terms and conditions of employment creates domestic strife and unrest, deprives the State of the fullest utilization of its capacities for advancement and development, and substantially and adversely affects the interests of employees, employers, and the public in general.

88. As described herein Defendant took adverse action against Plaintiff, including but not limited to terminating her employment, a position for which she was qualified because of her race and engaging in protected activities. Defendant's actions, as described herein, are in violation of the public policy of the State of North Carolina.

89. Defendant willfully, intentionally, maliciously, and with reckless disregard for Plaintiff's rights discriminated and retaliated against Plaintiff.

90. As a result of Defendant's conduct, Plaintiff has suffered damages, including but not limited to lost wages and benefits, in an amount to be determined at trial.

## PRAYER FOR RELIEF

91. WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

(a) Declaring that the acts and practices complained of herein are violations of Section 1981, Title VII, and the Public Policy of North Carolina;

(b) Enjoining and permanently restraining these violations;

(c) Directing Defendant to pay Plaintiff compensatory damages for her lost wages, lost benefits, front pay, mental anguish and emotional distress;

(d) Directing Defendant to pay Plaintiff punitive damages;

(e) Awarding Plaintiff pre- and post-judgment interest;

(f) Awarding Plaintiff the costs of this action together with reasonable attorneys' fees; and

(g) Granting such other and further relief as this Court deems necessary and proper.

## JURY DEMAND

92.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Respectfully submitted, this 11th day of June 2025.

**THE NOBLE LAW FIRM, PLLC.,**

*/s/ Kathryn F. Abernethy*

Kathryn F. Abernethy, Esq.
(N.C. Bar No. 43933)
700 Spring Forest Road, Suite 205
Raleigh, NC 27609
Telephone: (919) 251-6008
Fax: (919) 869-2079
Email: kabernethy@thenoblelaw.com
*Attorneys for Plaintiff*

**MESIDOR, PLLC.**
**ATTORNEYS AT LAW**

*/s/ Marjorie Mesidor*

Marjorie Mesidor
Itohen Ihaza
**Mesidor, PLLC**
*Attorneys for Plaintiffs (Pro Hac Anticipated)*
30 Station Road, Suite 5
Bellport, New York 11713
(212) 930-6010
mm@marjoriemesidor.com
ii@marjoriemesidor.com